IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs March 18, 2025 at Knoxville

**STATE OF TENNESSEE v. JEREMIAH DEVON COHILL**

**Appeal from the Circuit Court for Rutherford County**
**No. 84817B   Barry R. Tidwell, Judge**

_____

**No. M2023-01771-CCA-R3-CD**

_____

Defendant, Jeremiah Devon Cohill, was convicted by a jury of carjacking (count one), employing a firearm during the commission of a dangerous felony (count two), aggravated assault (count three), and conspiracy to commit carjacking (count four).  The trial court imposed an effective sentence of twenty-four years as a Range I offender to be served in confinement.  On appeal, Defendant argues that (1) the trial court committed plain error in its jury instruction for employment of a firearm during the commission of a dangerous felony; (2) the evidence was insufficient to support his convictions; (3) his sentence is excessive; and (4) the judgment for count one contains a clerical error.  Following our review of the entire record, the parties' briefs and the applicable law, we reverse, vacate and dismiss Defendant's conviction for employing a firearm during the commission of a dangerous felony (count two).  In all other aspects, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed in Part and Reversed in Part**

JILL BARTEE AYERS, J., delivered the opinion of the court, in which ROBERT L. HOLLOWAY, JR., and ROBERT H. MONTGOMERY, JR., JJ., joined.

Brad Stephens (on appeal), and Chase Fann (at trial), Murfreesboro, Tennessee, and Scott Saul (at trial), Nashville, Tennessee, for the appellant, Jeremiah Devon Cohill.

Jonathan Skrmetti, Attorney General and Reporter; Elizabeth Evan, Assistant Attorney General; Jennings H. Jones, District Attorney General; and John Zimmerman, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## Factual and Procedural Background

This case arose from an incident in which Defendant and his Co-defendant, Ja'Veon Brown,[1] met the victims, Victoria Claxton and her father, Shawn Frick, under the guise of buying Ms. Claxton's car and then stole the car after threatening the victims at gunpoint. The Rutherford County Grand Jury indicted Defendant for carjacking (count one), employing a weapon during a dangerous felony (count two), aggravated assault (count three), and conspiracy to commit carjacking (count four).

The following evidence was presented at trial: On July 29, 2020, Defendant and Co-defendant Brown, using the name "Jay Murda," contacted Ms. Claxton about purchasing a car that she had listed for sale on Facebook Marketplace.[2] The following day, July 30, 2020, Ms. Claxton agreed to meet the men at a Dollar General parking lot in Murfreesboro. Mr. Frick followed her in his vehicle with his nine-year-old son, Ms. Claxton's younger brother. After they arrived at the Dollar General, Ms. Claxton received a message asking if she could instead meet Defendant and Co-defendant Brown at a house on Gold Valley Drive near the Dollar General.

Ms. Claxton and Mr. Frick drove to the residence; she pulled her car into the driveway, and Mr. Frick parked on the street. Defendant and Co-defendant Brown were standing in the garage, which was empty. Mr. Frick noted at trial that it did not appear that anyone lived in the house. Ms. Claxton went into the garage with the car title and began talking to Defendant while Co-defendant Brown went with Mr. Frick to look at Ms. Claxton's car. Defendant and Co-defendant Brown then asked to take the car for a "test drive." Mr. Frick agreed and rode with them. Defendant drove the car, and Co-defendant Brown, who had a backpack with him, rode in the back seat. Ms. Claxton remained at the house with her brother.

After the test drive, Defendant parked the car in front of the house and indicated that he wanted to buy the vehicle. Mr. Frick remained in the car and asked Ms. Claxton to bring him the "paperwork." Mr. Frick began explaining the title to Defendant and asked him to sign it. He said that Defendant initially would not sign it; "[h]e started to sign and then stopped and then started." Mr. Frick then suggested that they get out of the car and move to the trunk for Defendant to have a flat surface on which to sign the title. After Defendant finally signed the title, they completed a bill of sale, and Ms. Claxton took pictures of both the title and the bill of sale. When Mr. Frick requested the agreed-upon payment of $4,000 for the vehicle, Co-defendant Brown reached into the backpack, pulled out a gun, pointed

---

[1] Co-defendant Brown pled guilty prior to Defendant's trial.

[2] Although Ms. Claxton drove the vehicle, Mr. Frick was listed as the owner on the title.

it at Mr. Frick, and said he "wanted" the keys to the car. Mr. Frick agreed that he was "afraid of challenging the gun" and did not want to "test it." Ms. Claxton "threw" the keys to Co-defendant Brown who then said that he wanted "all of the keys." Ms. Claxton told him that was all of them, and Defendant and Co-defendant Brown got into the car and drove away with Defendant driving and Co-defendant Brown in the back seat.

Mr. Frick testified that Co-defendant Brown never pointed the gun at Defendant, and Defendant did not react or seem fearful when Co-defendant Brown pulled the gun out of the backpack. Mr. Frick and Ms. Claxton got back into Mr. Frick's vehicle, and Ms. Claxton called 911. Officer Cameron Stamps[3] of the Murfreesboro Police Department ("MPD") arrived on the scene at approximately 5:00 p.m. Ms. Claxton told her that she had listed her vehicle for sale on Facebook Marketplace and that someone named "Jay Murda" responded that he would like to look at the car and buy it. She and Mr. Frick then told Officer Stamps what happened, and that Defendant and Co-defendant Brown had stolen the car at gunpoint. Officer Stamps issued a "[b]e on the lookout" ("BOLO") with Defendant's name, which had been signed to the back of the car title, and a description of the two men, what they were wearing, and their direction of travel.

Ms. Claxton's vehicle was located within minutes by MPD Officer Pam Goslee at an apartment complex on Journey Drive "maybe less than a mile" from the house on Gold Valley Drive. Officer Goslee saw a man exit the car, run to the apartment complex, and disappear into the breezeway. She notified other officers in the area to look for the individual.

MPD Officer Joshua Martin drove to the residence on Gold Valley drive, spoke with the victims, and then proceeded down the road to look for the suspects. He was flagged down by two individuals who said they saw two men run from the back of the Grove Apartment Complex across Woods Edge Drive and into a "field, vacant lot area." Officer Martin drove to the vacant lot and exited his patrol car. He saw two individuals in a thicket, and Co-defendant Brown ran out in front of him. Officer Martin drew his weapon and took Co-defendant Brown into custody. Co-defendant Brown immediately told Officer Martin that the key to Ms. Claxton's car was in his right pocket. Officer Martin also took Co-defendant Brown's cell phone. Defendant ran in the direction of Halls Hill Pike and into a wooded area behind some houses. Officer Martin gave the key and cell phone to MPD Detective Christopher Pate.

MPD Field Training Officer ("FTO") Cary Ridiner responded to the area where Co-defendant Brown had been taken into custody and searched for Defendant. He responded to a residence on Halls Hill Pike and saw Defendant who was shirtless with several abrasions and scratches. Officer Ridiner took Defendant into custody and advised him of

---

[3] At the time of trial, Officer Stamps was no longer employed by the police department.

his *Miranda* rights. He also seized Defendant's cell phone and later gave it to Detective Pate.

Ms. Claxton and Mr. Frick traveled to the police department and gave statements. They were shown a photographic lineup, and Mr. Frick identified Co-defendant Brown. Mr. Frick was shown a second photographic lineup but did not identify anyone. Ms. Claxton was able to identify both Defendant and Co-defendant Brown from the photographic lineups.

Detective Pate[4] interviewed Defendant, who claimed that his mother gave him $4,000 to buy Ms. Claxton's car. However, there was no evidence that the money existed, and Defendant was never clear on whether his mother provided him with cash or a check for the vehicle. Defendant told Detective Pate that he messaged Ms. Claxton about buying the car and that he intended to purchase it. Detective Pate said Defendant claimed that during the test drive, Co-defendant Brown "kept bumping his seat, like, kinda of like trying to signal him or something, but he didn't know what [Co-defendant] Brown wanted." Defendant said that they came back to the house, and he was going to sign the car title when Co-defendant Brown produced the gun and "basically held him and them at gunpoint and demanded the keys, made him get in the car, and they fled, or made him drive off from the scene." Defendant also told Detective Pate that he had only known Co-defendant Brown twelve hours or less, and they met playing basketball. Detective Pate testified that Co-defendant Brown would not tell him where the gun was located because it did not belong to him, and "it wasn't his to tell." Defendant indicated that the gun had been left in an apartment, but he would not reveal which apartment number.

Detective Pate then interviewed Co-defendant Brown, who initially said that the carjacking was not his idea and that it had been set up by a friend, whom he later agreed was Defendant. Co-defendant Brown claimed that he did not know anything about the carjacking when the victims arrived at the house and that Defendant pulled out the gun. Eventually, Co-defendant Brown said that Defendant arranged the meeting, and Co-defendant Brown produced the weapon. He indicated that he was the "muscle" behind the carjacking, and Defendant was the "brains." At trial, Detective Pate noted that the only consistency between Defendant's and Co-defendant Brown's statements was that Defendant set it up.

Detective Pate testified that he began receiving letters from Co-defendant Brown after both defendants were incarcerated. In the letters, and in a statement to Detective Whitaker, Co-defendant Brown claimed that Defendant had the money to purchase the car "but [Co-defendant Brown] pulled the gun out anyway."

---

[4] Detective Pate is now Sergeant Pate.

- 4 -

Co-defendant Brown testified that he entered a guilty plea in this case and identified his sworn affidavit in support of the plea concerning the offenses. He agreed that Detective Pate and the prosecutor showed him a video in which he and Defendant were shooting a gun in Ripley, Tennessee. There was also a video of Defendant in the driver's seat of a car in possession of the gun used in the present offenses. Co-defendant Brown was in the back seat. In his affidavit, Co-defendant Brown made the following statement:

> After a while, I was invited to spend some time with [Defendant] at his home in Ripley. While there, [Defendant] showed me a large semi-automatic handgun with extended magazine that belonged to him. This was the same gun, later used in the carjacking in this case. We took videos on my phone of both me and [Defendant], shooting the large gun. This was at a vacant elementary school in Ripley. I was shown those videos during the January 30, meeting referred to above. And in the two videos, I was shown, [Defendant] is wearing the white T-shirt, and I'm wearing the black shirt.

Co-defendant Brown also said that the day before the carjacking, Defendant wanted a car and "said he knew how to get one" although Defendant did not have money or a job. In the affidavit, Co-defendant Brown stated that in the second video, he was holding a "handgun that I bought off the streets in Memphis."

Co-Defendant Brown also stated in his affidavit that he came to Murfreesboro in June 2020 "to hang out" with Defendant, and Co-defendant Brown brought his handgun with him. They stayed in an apartment at The Grove Apartment Complex where they were found after the offenses. Co-defendant Brown stated that Defendant "kept his gun, the one used in the carjacking" at this apartment. They took photos with the weapon, and Co-defendant Brown used it for his "phone screen." Co-defendant Brown further declared:

> While here in Murfreesboro, [Defendant] set up some robberies. I would take the property and turn it over to [Defendant]. He would get rid of the property. I would describe our partnership as two brothers and that I was the muscle and [Defendant] was the one who set up each robbery, using his Facebook account. I used the word "mastermind" in describing [Defendant's] role in the robberies when I was first interviewed by Detective Pate, following my arrest in the carjacking. He planned them, I did the robbery and gave him the property.
>
> I had no Facebook account, and [Defendant] used his account to set up the robbery - - set up each robbery.

Co-defendant Brown further stated:

The day we were arrested, he had told me to come with him that he was getting a car. [Defendant] and I walked to Gold Valley Road where we found a house for rent. We took down the sign and acted like we lived there. The girl drove up in the car and we took it for a test drive. The girl handed the title to [Defendant] and he signed it. She took a picture of it and when she asked for the money, I pulled out [Defendant's] gun from the backpack. [Defendant] knew I took his gun -- I was to be the muscle. [Defendant] demanded the keys as I held the gun on the girl. We got into the car with [Defendant] driving. I took [Defendant's] gun and put it back in the backpack along with the title. After my arrest, I never saw [Defendant's] backpack, or his gun or the title.

I looked out the window to the parking lot where [Defendant] had parked the stolen car and saw that it was parked away from any other cars and was easy to spot. So, I got my handgun and went out to move the car between some other cars to try to hide it better. After I moved the car, I saw the police officer driving in and realized that I had been spotted. I took off running towards the breezeway near [Defendant's apartment]. [Defendant] also saw what was happening from the apartment and he came out and we were both running away.

We both ran near the gate in the rear of the apartments. While running I threw my handgun towards the backyard of one of the houses near the back gate. I showed Det[ective] Pate during the meeting mentioned above on an aerial map where I threw my handgun. I had my phone with me when arrested.

In the final paragraph of the affidavit, Co-defendant Brown acknowledged that he originally told detectives in his prior statements that Defendant had nothing to do with the offenses and that he would "take" the charges and clear Defendant. However, he decided to no longer lie for Defendant when Co-defendant Brown's attorney informed him that Defendant claimed that Co-defendant Brown threatened him and held a gun to him.

At trial, Co-defendant Brown said that the information contained in his affidavit was not true and that he lied to the trial court concerning his guilty plea. He further admitted that he pled guilty to two additional robberies along with the offenses in this case and received an effective twelve-year sentence for all three cases.

On cross-examination, Co-defendant Brown testified that he committed the carjacking in this case and that Defendant did not know that there would be a carjacking. He was aware that his plea agreement contained a paragraph indicating that his agreement was "null and void" if he testified or communicated to anyone that any of his statements in the affidavit were not true or that he was coerced to sign the affidavit. The agreement

further stated that "the State may set aside this agreement, set aside my guilty pleas, and prosecute these charges as if there was no plea bargain." Defendant reiterated that his original statements indicating that Defendant had nothing to do with the carjacking were true. Co-defendant Brown claimed that he decided to implicate Defendant in the offenses because Co-defendant Brown was upset that he got caught.

Based on this evidence, the jury convicted Defendant as charged in the indictment.

*Sentencing*

The presentence report was entered as an exhibit to the hearing. Officer James Cunningham of the LaVergne Police Department testified that he arrested Defendant on November 23, 2022, for burglary in another case. Defendant had been released on bond for the present offenses when he committed the burglary.

Mr. Frick submitted a victim impact statement. He testified that after Ms. Claxton returned home on the day of the offenses, Defendant called her from the jail booking area, which greatly upset her. He said: "She was extremely nervous, crying, shaky. She was - - she was just ready to change everything and run." Mr. Frick noted that Ms. Claxton also changed her phone number. He said that she was afraid to leave her home after the carjacking, and she had some anxiety.

On cross-examination, Mr. Frick testified that Defendant apologized when he called Ms. Claxton and said that he "really did want to buy the car." Defendant also said that he did not know that anything was going to happen. On redirect examination, Mr. Frick opined that Defendant "was not surprised" and knew "exactly what was happening."

The trial court found that Defendant was a Range I, standard offender with no prior convictions and applied three enhancement factors: that Defendant was the leader in the commission of an offense involving two or more actors; that there was more than one victim because Ms. Claxton was the victim in count one, and Mr. Frick was the victim in count three; and that Ms. Claxton's "response" to the offenses "was particularly great" even though she was better at the time of the sentencing hearing, years after the offenses occurred. T.C.A. § 40-35-114(2), (3), and (6). The trial court gave enhancement factor two "great weight," factor three "very little weight," and factor six "moderate weight." The court did not apply any mitigating factors.

In considering consecutive sentencing, the trial court noted "by operation [of] statute that [c]ount 2 is mandatory consecutive in this case to [c]ount 1." The court found that Defendant "is a dangerous offender whose behavior indicates little or no regard for human life" and no hesitation about committing a crime when the risk to human life is high. *Id.* § 40-35-115(2), (3), and (4). The trial court also found that the circumstances surrounding the offense were "aggravated."

In finding Defendant to be a dangerous offender, the trial court considered the factors under *State v. Wilkerson*, 905 S.W.2d 933, 937-39 (Tenn. 1995), and found that "an extended sentence [was] necessary" to protect society because Defendant was arrested again "some two years" after the offenses in this case for "further criminal conduct." The trial court concluded "that based on the severity of the offenses committed that consecutive sentences are reasonably related." The trial court further concluded:

> As I stated earlier, this was a well planned out carjacking, aggravated assault where multiple messages were sent and received over, I guess Facebook or a Messenger type application where [Defendant] and [Co-defendant Brown] had multiple, multiple opportunities to not go through with what they did to these two victims. Well, really these three victims. But Ms. Claxton, Mr. Frick specifically in this case. Lured them to Murfreesboro to a public place. At the last minute changed the location to the house. And then once they arrived, the plan was put into - - I guess was completed at that point. Took the car on a test drive, which is just simply beyond my comprehension that you could plan something and be so cool and collected about a carjacking that you would take the time to test drive the car. I suppose as if it didn't sound right that we might abandon the carjacking because we want a better car. I don't know what the reason for that is. But it's incomprehensible that you would take the time to test drive the car. And then at that point take the car from these victims at gun point.
>
> It's an extremely, extremely violent and serious offense. There is really no reason for it.

The trial court considered the factors for alternative sentencing and found that none of them "favor probating any of these sentences." More specifically, the trial court found that "confinement is particularly suited to provide an effective deterrent to others likely to commit similar offenses." The trial court further concluded:

> I do not find that measures less restrictive have frequently or recently been applied to the original convictions in this case. However, based on the fact that he was out from this case and has now been charged with other crimes, I do find that that factor applies in my assessment of whether probation is warranted. And find that it does not favor [Defendant].
>
> And then finally, I find that confinement is necessary to avoid depreciating the seriousness of the offense. Specifically, and I'm not required to find this based on finding other factors within 40-35-103, but I'm going to specifically find that the criminal act here is especially violent, horrifying, shocking, and reprehensible.

- 8 -

I don't find that there's potential for rehabilitation or treatment of [Defendant]. And I find in looking at the factors in *State v. Washington* that none of those factors favor [Defendant].

The trial court sentenced Defendant as a Range I offender to twelve years at seventy-five percent release eligibility for count one, six years at one hundred percent for count two, and six years at thirty percent each for counts three and four. The trial court ordered counts one and two to be served consecutively as a matter of law, count three to be served consecutively to count two, and count four to be served concurrently with count one for an effective twenty-four-year sentence to be served in confinement. Defendant filed a timely motion for new trial that was denied by the trial court. It is from this that Defendant now appeals.

## Analysis

### I. Jury Instructions

Defendant contends that the trial court erred in instructing the jury on employment of a firearm during the commission of a dangerous felony under Tennessee Code Annotated 39-17-1324 in count two of the indictment. Because Defendant failed to object to the jury instruction at trial or raise the issue in his motion for new trial, he requests that we review this issue as a matter of plain error. The State argues that Defendant cannot establish plain error.

Defendant's brief argues that the trial court's jury instruction on the count two charge of employment of a firearm during the dangerous felony of carjacking was plain error because that charge, along with the jury instruction that the count one carjacking charge could have been committed by force or intimidation or by use of a deadly weapon, created a violation of Tennessee Code Annotated section 39-17-1324. The State's responsive brief also addresses the issue in the context of the jury instruction and argues that because Defendant was charged with both theories of carjacking, the jury could have found Defendant guilty of the crime by force or intimidation and not by use of the deadly weapon, thereby allowing the firearm charge to proceed.

Thus, while the issue was raised as a jury instruction issue, the parties' briefs address both the jury instructions and the case law interpreting and applying the Tennessee Code Annotated section 39-17-1324(c) prohibition that a person may not be charged with employing a firearm during the commission of a dangerous felony when possessing or employing a firearm is an essential element of the dangerous felony. T.C.A. § 39-17-1324(c). Accordingly, we will address the issue in the context of the jury instructions and as to whether the count two firearm conviction was void. *See Byers v. State*, No. W2011-00473-CCA-R3-PC, 2012 WL 938976, at *8 (Tenn. Crim. App. Mar. 15, 2012) (holding that charging a defendant with employing a firearm during the commission of a dangerous

felony and especially aggravated kidnapping by use of a deadly weapon when the deadly weapon used was a firearm was in direct contravention to Tennessee Code Annotated section 39-17-1324(c) resulting in a "void" conviction).

The offense of carjacking may be committed in either of two ways: by use of a deadly weapon or by force or intimidation. T.C.A. § 39-13-404(a). The State is not required to make an election when there is a single count of carjacking committed under alternative theories. *State v. Wade*, No. M2020-01518-CCA-R3-CD, 2021 WL 3197195, at *1-2 (Tenn. Crim. App. July 29, 2021), *perm. app. denied* (Tenn. Oct. 13, 2021). However, pursuant to statute, a person may not be charged with employing a firearm during the commission of a dangerous felony, in this case carjacking, when possessing or employing a firearm is an essential element of the dangerous felony. T.C.A. § 39-17-1324(a), (c), (i)(1)(D).

Turning to the issue in the context of the jury instruction, generally, an issue is waived when a defendant fails to make a contemporaneous objection during trial and fails to raise the issue in a motion for new trial. *See* Tenn. R. App. P. 36(a); Tenn. R. App. P. 3(e). "Ordinarily, issues raised for the first time on appeal are waived." *State v. Alvarado*, 961 S.W.2d 136, 153 (Tenn. Crim. App. 1996) (citing *State v. Burtis*, 664 S.W.2d 305, 310 (Tenn. Crim. App. 1983)). However, under the plain error doctrine, "[w]hen necessary to do substantial justice, an appellate court may consider an error that has affected the substantial rights of a party at any time, even though the error was not raised in the motion for a new trial[.]" Tenn. R. App. P. 36(b).

To obtain relief under plain error, the defendant must demonstrate the existence of five factors: (1) the record clearly establishes what occurred in the trial court; (2) a clear and unequivocal rule of law was breached; (3) a substantial right of the accused was adversely affected; (4) the accused did not waive the issue for tactical reasons; and (5) consideration of the error is necessary to do substantial justice. *State v. Rimmer*, 623 S.W.3d 235, 255-56 (Tenn. 2021) (citing *State v. Martin*, 505 S.W.3d 492, 504 (Tenn. 2016)). Because this court will only grant plain error relief when all five factors have been established, we need not consider all factors if it is clear from the record that at least one factor cannot be established. *State v. Smith*, 24 S.W.3d 274, 283 (Tenn. 2000). Plain error relief should be "sparingly exercised." *State v. Bledsoe*, 226 S.W.3d 349, 354 (Tenn. 2007). Thus, plain error relief is only warranted when the error was "of such a great magnitude that it probably changed the outcome of the trial." *State v. Adkisson*, 899 S.W.2d 626, 642 (Tenn. Crim. App. 1994) (quoting *United States v. Kerley*, 838 F.2d 932, 937 (7th Cir. 1988)).

In this case, Defendant can clearly establish factors one, two, three, and five to establish plain error. Here, the record clearly establishes what happened in the trial court. Defendant was indicted for carjacking by force or intimidation or with a deadly weapon (count one). He was also indicted for employing a firearm during the commission of a

dangerous felony, to wit: carjacking (count two).  At trial, the court instructed the jury on the offense of employing a firearm during the commission of a dangerous felony as follows:

> Any person who employs a firearm during the commission of a dangerous offense is guilty of a crime.
>
> For you to find the Defendant guilty of this offense, the State must have proven beyond a reasonable doubt the existence of the following essential elements:
>
> > (1) that the Defendant employed a firearm; and
> >
> > (2) that the employment was during the commission of "carjacking;" and
> >
> > (3) that the Defendant acted either intentionally, knowingly, or recklessly.

The trial court instructed the jury on carjacking as follows:

> Any person who commits the offense of carjacking is guilty of a crime.
>
> For you to find the Defendant guilty of this offense, the State must have proven beyond a reasonable doubt the existence of the following essential elements:
>
> > (1) that the Defendant took a motor vehicle from the possession of another by use of a deadly weapon or by use of force or intimidation; and
> >
> > (2) that the Defendant acted either intentionally or knowingly.

In closing argument, the State argued that the carjacking was committed by force with a deadly weapon, a firearm.  The proof at trial also showed that the carjacking in this case was committed with a firearm.  Defendant was convicted of carjacking and employing a firearm during the commission of a dangerous felony in accordance with the indictment and jury charge.

In this case, Defendant was indicted under both theories of carjacking: "[Defendant] did unlawfully and knowingly take a motor vehicle from the possession of Victoria Claxton by use of a deadly weapon, to-wit: a firearm, or by the use of force or intimidation."  The

- 11 -

trial court then instructed the jury on both theories. The trial court also charged the jury on count two, employing a firearm during the commission of the dangerous felony of carjacking.

"[T]he trial court has a duty 'to give a complete charge of the law applicable to the facts of a case.'" *State v. Thompson*, 285 S.W.3d 840, 842 n.1 (Tenn. 2009) (quoting *State v. Harbison*, 704 S.W.2d 314, 319 (Tenn. 1986)). "Moreover, the trial court must provide the jury with proper instructions as to the law governing the issues raised and the evidence introduced even without request." *State v. Powell*, No. E2011-00155-CCA-R3-CD, 2012 WL 1655279, at *15 (Tenn. Crim. App. May 10, 2012) (citing *State v. Dorantes*, 331 S.W.3d 370, 390 (Tenn. 2011)). As discussed above, because Defendant was charged with carjacking committed by use of a deadly weapon, the charging of employment of a firearm during the commission of the felony of carjacking was contrary to Tennessee Code Annotated section 39-17-1324(c). For these same reasons, a substantial right of the accused was adversely affected.

Also, consideration of the error is necessary to do substantial justice. As discussed above, Defendant could not be convicted of both carjacking by use of a deadly weapon and employing a firearm during the commission of the dangerous felony of carjacking. *Byers*, 2012 WL 938976, at *9.

However, as to the fourth factor of plain error review, we cannot say that Defendant did not waive this issue for tactical reasons. It may very well be that trial counsel realized that Defendant could not be indicted for both carjacking by use of a deadly weapon and employing a firearm during the commission of a dangerous felony and therefore, chose to raise this issue for the first time on appeal under plain error in order for the mandatory consecutive conviction to be dismissed as void.

Although Defendant has not established plain error, we conclude that Defendant's conviction for employing a firearm during the commission of a dangerous felony is void. The State charged Defendant in a single indictment with carjacking by force or intimidation or by use of a deadly weapon, specifically a firearm. Thus, the inclusion of the deadly weapon element in the carjacking charge precluded the State from then proceeding with the count two charge of employing a firearm during the commission of the carjacking because it is in direct contravention of Tennessee Code Annotated section 39-17-1324(c). *See Byers*, 2012 WL 938976, at *9; *State v. Dawson*, No. W2010-02621-CCA-R3-CD, 2012 WL 1572214, at *8 (Tenn. Crim. App. May 2, 2012). In *Thomas v. State*, No. W2012-01646-CCA-R3-PC, 2013 WL 5761398, at *6 (Tenn. Crim. App. June 28, 2013), a panel of this court noted:

By promulgating this statutory provision, our legislature barred the criminal prosecution of violations of section 39-17-1324 when the underlying dangerous felony included, as an essential element, the use of a firearm. The

- 12 -

practical result is that, when the underlying dangerous felony includes the use of a firearm as an essential element, the separate crime of employing a firearm during the commission of the dangerous felony does not exist. In such an instance, this [c]ourt previously has recognized, "due process does not countenance the conviction of a nonexistent crime." *State v. Powell*, No. E2011-00155-CCA-R3-CD, 2012 WL 1655279, at *15 (Tenn. Crim. App. May 10, 2012) (citing *Adams v. Murphy*, 653 F.2d 224, 225 (5th Cir. 1981)).

Therefore, we reverse, vacate and dismiss Defendant's conviction for employing a firearm during the commission of a dangerous felony in count two.

## II. Sufficiency of the Evidence

Defendant contends that the evidence was insufficient to support each of his convictions. Even though we have dismissed count two, we will address the sufficiency of the evidence for all counts in the event of further appellate review. *See State v. McKinney*, No. M2014-02125-CCA-R3-CD, 2016 WL 106790, at *15 (Tenn. Crim. App. Jan. 11, 2016). The State contends that the evidence is sufficient to support Defendant's convictions. We agree with the State.

When a defendant challenges the sufficiency of the evidence, this court is obliged to review that claim according to certain well-settled principles. The relevant question is whether *any* rational trier of fact could have found the accused guilty of every element of the offense beyond a reasonable doubt. *See* Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *State v. Davis*, 354 S.W.3d 718, 729 (Tenn. 2011).

Because the jury's verdict replaces the presumption of innocence with one of guilt, the burden on appeal is shifted onto the defendant to show that the evidence introduced at trial was insufficient to support such a verdict. *State v. Reid*, 91 S.W.3d 247, 277 (Tenn. 2002). Thus, "'we afford the prosecution the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences which may be drawn therefrom.'" *Davis*, 354 S.W.3d at 729 (quoting *State v. Majors*, 318 S.W.3d 850, 857 (Tenn. 2010)). Questions involving the credibility of witnesses and the weight and value to be given the evidence, as well as all factual disputes raised by the evidence, are resolved by the jury as the trier of fact. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990). "A guilty verdict by the jury, approved by the trial court, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the prosecution's theory." *Reid*, 91 S.W.3d at 277 (quoting *Bland*, 958 S.W.2d at 659). It is not the role of this court to reweigh or reevaluate the evidence, nor to substitute our own inferences for those drawn from the evidence by the trier of fact. *Id.* The standard of review is the same whether the conviction is based upon direct evidence, circumstantial evidence, or a combination of the two. *Dorantes*, 331 S.W.3d at 379; *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009).

Under the theory of criminal responsibility, "[a] person is criminally responsible as a party to an offense, if the offense is committed by the person's own conduct, by the conduct of another for which the person is criminally responsible, or by both." T.C.A. § 39-11-401(a). Criminal responsibility for the actions of another arises when a defendant, "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, . . . solicits, directs, aids, or attempts to aid another person to commit the offense[.]" *Id.* at § 39-11-402(2). Criminal responsibility is not a separate crime but a "theory by which the State may prove the defendant's guilt of the alleged offense . . . based upon the conduct of another person." *State v. Lemacks*, 996 S.W.2d 166, 170 (Tenn. 1999). "[U]nder the theory of criminal responsibility, presence and companionship with the perpetrator of a felony before and after the commission of the crime are circumstances from which an individual's participation may be inferred." *State v. Phillips*, 76 S.W.3d 1, 9 (Tenn. Crim. App. 2001). However, "the evidence must establish that [the] defendant in some way knowingly and voluntarily shared in the criminal intent of the crime and promoted or assisted its commission." *State v. Pope*, 427 S.W.3d 363, 369 (Tenn. 2013).

As relevant to this case, the crime of carjacking is defined as "the intentional or knowing taking of a motor vehicle from the possession of another by use of: (1) [a] deadly weapon; or (2) [f]orce or intimidation." T.C.A. § 39-13-404(a).

It is an offense to employ a firearm during the commission of or attempt to commit a dangerous felony. *Id.* § 39-17-1324(b). Carjacking as defined in Tennessee Code Annotated section 39-13-404 is a dangerous felony. *Id.* § 39-17-1324(i)(1)(D).

A person commits aggravated assault when he or she "intentionally or knowingly commits an assault" involving the "use or display of a deadly weapon." *Id.* § 39-13-102(a)(1)(A)(iii). A person commits assault by "intentionally or knowingly" causing the victim to "reasonably fear imminent bodily injury." *Id.* § 39-13-101(a)(2).

Defendant was also convicted of conspiracy to commit carjacking. The offense of conspiracy is committed if two or more people, each having the culpable mental state required for the offense which is the object of the conspiracy and each acting for the purpose of promoting or facilitating commission of an offense, agree that one or more of them will engage in conduct which constitutes such offense. *Id.* § 39-12-103(a). It is also required that "an overt act in pursuance of the conspiracy is alleged and proved to have been done by the person or by another with whom the person conspired." *Id.* § 39-12-103(d).

To prove the existence of a conspiratorial relationship, the State may show that a "mutual implied understanding" existed between the parties. *State v. Shropshire*, 874 S.W.2d 634, 641 (Tenn. Crim. App. 1993). A formal agreement is not necessary. *Id.* The

- 14 -

conspiracy may be demonstrated by circumstantial evidence and the conduct of the parties while undertaking the illegal activity. *Id.* "'Conspiracy implies concert of design and not participation in every detail of execution.'" *Id.* (quoting *Randolph v. State*, 570 S.W.2d 869, 871 (Tenn. Crim. App. 1978)).

Viewed in a light most favorable to the State, Defendant in this case was involved in contacting Ms. Claxton under the guise of buying a car she had listed for sale on Facebook Marketplace. Defendant arranged the meeting with Ms. Claxton, who was accompanied by her father, Mr. Frick, and her younger brother, at an unoccupied residence on Gold Valley Drive. Co-defendant Brown, who was armed with a handgun that he carried in a backpack, accompanied Defendant to the meeting point. Defendant test-drove the car with Co-defendant Brown and Mr. Frick after which, Defendant indicated that he would buy the car. He even signed the title and the bill of sale was completed.

When Mr. Frick asked for payment for the car, Co-defendant Brown pulled the gun out of his backpack, pointed it at Mr. Frick, and demanded the keys to the vehicle. Mr. Frick testified that he was afraid of "challenging the gun" and "wasn't going to test it." Defendant then drove away in the car with Co-defendant Brown in the back seat. The two men later fled together to avoid police after the car was found. At trial, Mr. Frick testified that Co-defendant Brown never pointed the gun at Defendant, and Defendant did not react or seem fearful when Co-defendant Brown pulled the gun out of the backpack.

In his sworn affidavit in support of his guilty plea, which was introduced at trial, Co-defendant Brown identified videos of him and Defendant in Ripley, Tennessee in possession of and shooting the gun that was used in the offenses in this case. He and Defendant also took photos with the weapon. Co-defendant Brown further declared:

> While here in Murfreesboro, [Defendant] set up some robberies. I would take the property and turn it over to [Defendant]. He would get rid of the property. I would describe our partnership as two brothers and that I was the muscle and [Defendant] was the one who set up each robbery, using his Facebook account. I used the word "mastermind" in describing [Defendant's] role in the robberies when I was first interviewed by Detective Pate, following my arrest in the carjacking. He planned them, I did the robbery and gave him the property.
>
> I had no Facebook account, and [Defendant] used his account to set up the robbery - - set up each robbery.

Co-defendant Brown also said that Defendant knew he took the gun from the backpack and knew Co-defendant Brown was to be the "muscle."

- 15 -

From this proof, a reasonable jury could conclude that Defendant was criminally responsible for the intentional or knowing taking of Ms. Claxton's vehicle by use of a deadly weapon or use of force or intimidation and for Co-defendant Brown's use of the gun to cause Mr. Frick to "reasonably fear imminent bodily injury." The facts also support the State's theory that Defendant and Co-defendant Brown conspired to take Ms. Claxton's vehicle and took an overt act to complete the act of carjacking, and that Defendant was criminally responsible for Co-defendant Brown's employment of a firearm during the carjacking. We note that although Co-defendant Brown recanted the statements contained in his affidavit at trial, the jury was free to disbelieve him. Defendant is not entitled to relief on this issue.

### III.    Sentencing

Defendant argues that the trial court erred in weighing the enhancement factors that were applied to his sentences, by finding him to be a dangerous offender under *State v. Wilkerson*, 905 S.W.2d 933 (Tenn. 1995), and by imposing partial consecutive sentencing. In the event of further appellate review, we will address sentencing for Defendant's dismissed conviction for employing a firearm during the commission of a dangerous felony in count two. *State v. Ashley*, No. W2004-01319-CCA-MR3-CD, 2006 WL 889567, *6 (Tenn. Crim. App. Apr. 5, 2006). The State asserts that the sentences are proper. We agree with the State.

On appeal, the party challenging the sentence bears the burden of establishing that the sentence is improper. *State v. Branham*, 501 S.W.3d 577, 595 (Tenn. Crim. App. 2016). This court reviews sentencing decisions under an "abuse of discretion standard of review, granting a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). "A trial court abuses its discretion when it applies incorrect legal standards, reaches an illogical conclusion, bases its ruling on a clearly erroneous assessment of the proof, or applies reasoning that causes an injustice to the complaining party." *State v. Phelps*, 329 S.W.3d 436, 443 (Tenn. 2010) (citing *State v. Jordan*, 325 S.W.3d 1, 38-40 (Tenn. 2010)).

Once a trial court determines the appropriate range of punishment, the trial court must consider: (1) the evidence received at trial and the sentencing hearing; (2) the presentence report, including a validated risk and needs assessment; (3) any arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct; (5) any applicable mitigating and enhancement factors; (6) any statement the defendant makes on his behalf; and (7) statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee. T.C.A. § 40-35-210(a), (b). Additionally, the sentence imposed should be "no greater than that deserved for the offense committed" and "the least severe measure necessary to achieve the purposes for which the sentence is imposed." *Id.* § 40-35-103(2), (4).

When adjusting the length of a sentence within the appropriate range, a trial court is guided by, but not bound by, any applicable mitigating and enhancement factors. *State v. Mosley*, No. W2022-01424-CCA-R3-CD, 2024 WL 1406156, at *21 (Tenn. Crim. App. Apr. 2, 2024) (quoting *Bise*, 380 S.W.3d at 706), *perm. app. denied* (Tenn. July 18, 2024). It is within the trial court's sound discretion to weigh any applicable mitigating or enhancement factors. *State v. Nelson*, No. M2023-00176-CCA-R3-CD, 2024 WL 1192985, at *15 (Tenn. Crim. App. Mar. 20, 2024) (quoting *State v. Carter*, 254 S.W.3d 335, 345 (Tenn. 2007)), *no perm. app. filed*. Thus, "a trial court's misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed" from the sentencing act. *Bise*, 380 S.W.3d at 706.

Here, the trial court found that Defendant was a Range I, standard offender. *See* T.C.A. § 40-35-105. The trial court imposed within-range sentences for each conviction. *See id.* § -112(a)(2), (a)(4) (mandating that a Range I sentence be between eight and twelve years for a Class B felony and three years and six years for a Class C felony). Additionally, the trial court imposed partial consecutive sentencing. *See id.* § -115(a)(5).

The trial court applied three enhancement factors: that Defendant was the leader in the commission of an offense involving two or more actors; that there was more than one victim because Ms. Claxton was the victim in count one, and Mr. Frick was the victim in count three; and that Ms. Claxton's "response" to the offenses "was particularly great" even though she was better at the time of the sentencing hearing, years after the offenses occurred. *Id.* § -114(2), (3), and (6). Defendant does not contest application of the three factors, and the record reflects that they were appropriately applied. The trial court gave enhancement factor two "great weight," factor three "very little weight," and factor six "moderate weight." The court found that no mitigating factors applied.

Defendant contends that the trial court erred in applying "great weight" to enhancement factor two, that Defendant was the leader in an offense involving two or more actors. In his brief, he argues that "the trial court abused its discretion by giving great weight to a factor so heavily reliant on the statements of a perjured witness." However, it is well-settled that "mere disagreement with the trial court's weighing of the properly assigned enhancement and mitigating factors is no longer a ground for appeal" since the 2005 amendments to the Sentencing Act. *Bise*, 380 S.W.3d at 706; *see State v. Barnes*, No. M2024-00016-CCA-R3-CD, 2025 WL 25896, at *11 (Tenn. Crim. App. Jan. 3, 2025), *perm. app. pending*. Defendant is not entitled to relief because the trial court properly exercised its discretion in imposing a within-range sentence of twelve years in count one and six years each in counts two, three, and four.

The standard of review adopted in *Bise* applies to decisions by trial courts regarding consecutive sentencing. *State v. Pollard*, 432 S.W.3d 851, 859 (Tenn. 2013). This means that the reviewing court will give "deference to the trial court's exercise of its discretionary

authority to impose consecutive sentences if it has provided reasons on the record establishing at least one of the seven grounds listed in Tennessee Code Annotated section 40-35-115(b)." *Id.* at 861. As relevant to this case, the trial court may order sentences to run consecutively if it finds by a preponderance of the evidence that a defendant is "a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high[.]" T.C.A. § 40-35-115(b)(4).

Before a trial court may impose consecutive sentences on the basis that a defendant is a dangerous offender, the trial court must find that consecutive sentences are reasonably related to the severity of the offenses committed and are necessary to protect the public from further criminal conduct. *Wilkerson*, 905 S.W.2d at 937-39. "The adoption of the abuse of discretion standard with the presumption of reasonableness has not eliminated this requirement." *Pollard*, 432 S.W.3d at 863. In order to limit the use of the "dangerous offender" category to cases where it is warranted, the trial court must make specific findings about "particular facts" which show that the *Wilkerson* factors apply to the defendant. *State v. Lane*, 3 S.W.3d 456, 461 (Tenn. 1999).

When imposing consecutive sentences, the trial court must still consider the general sentencing principles that each sentence imposed shall be "justly deserved in relation to the seriousness of the offense," "no greater than that deserved for the offense committed," and "the least severe measure necessary to achieve the purposes for which the sentence is imposed." T.C.A. §§ 40-35-102(1), -103(2), -103(4); *State v. Imfield*, 70 S.W.3d 698, 708 (Tenn. 2002). "So long as a trial court properly articulates reasons for ordering consecutive sentences, thereby providing a basis for meaningful appellate review, the sentences will be presumed reasonable and, absent an abuse of discretion, upheld on appeal." *Pollard*, 432 S.W.3d at 862 (citing Tenn. R. Crim. P. 32(c)(1); *Bise*, 380 S.W.3d at 705).

We first note that the firearm charge in count two is required to be served consecutively to "any other sentence the person is serving at the time of the offense or is sentenced to serve for conviction of the underlying dangerous felony." *Id.* § 39-17-1324(e)(1). Thus, were the firearm conviction not dismissed in this case, it was appropriately ordered to be served consecutively.

Regarding the remaining sentences, the trial court in this case made the findings required under *Wilkerson* and cited specific facts from the case to support the imposition of consecutive sentences. The trial court specifically found that Defendant was a "dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high." T.C.A. § 40-35-115(b)(4). The court further found that an "extended sentence is necessary to protect the public against further criminal conduct" noting that Defendant was arrested for burglary while on bond in this case. *Wilkerson*, 905 S.W.2d at 939.

The trial court concluded that the circumstances of the offenses were "aggravated" and said, "He has no hesitation about committing a crime when the risk to human life is high. I would note that that is inherent in all four of these conviction offenses as I have previously found." In determining that consecutive sentences in the case reasonably relate to the severity of the offenses, the trial court noted that Defendant and Co-defendant Brown had a "well planned out carjacking, aggravated assault" and that they lured the victims to a public place through "messages . . . sent and received over . . . Facebook." The court also pointed out that Defendant and Co-defendant Brown had "multiple, multiple opportunities to not go through with what they did to these two victims." The court concluded, "It's an extremely, extremely violent and serious offense. There is really no reason for it."

Because the trial court stated its reasons for running the sentences consecutively as required under *Wilkerson* and *Pollard*, and those reasons are consistent with the principles and purposes of sentencing, we defer to the trial court's sentencing decision. The trial court did not abuse its discretion in sentencing Defendant. Defendant has not overcome the presumption that his sentence is reasonable and is not entitled to relief.

## IV.    Clerical Error on the Judgment Forms

Finally, Defendant contends that the judgment form for count one contains a clerical error concerning the calculation of pretrial jail credits. We also note that this same calculation of pretrial jail credit is also shown on the judgment form for count four.

Tennessee Rule of Criminal Procedure 36 provides that "the court may at any time correct clerical mistakes in judgments, orders, or other parts of the record, and errors in the record arising from oversight or omission." Clerical errors "arise simply from a clerical mistake in filling out the uniform judgment document and may be corrected at any time[.]" *State v. Brown*, 479 S.W.3d 200, 208 (Tenn. 2015) (citation and internal quotations omitted). Correcting clerical mistakes may include "supply[ing] omitted or overlooked information." *State v. Allen*, 593 S.W.3d 145, 154 (Tenn. 2020). "To determine whether a clerical error has been made, a court ordinarily must compare the judgment with the transcript of the trial court's oral statements." *Brown*, 479 S.W.3d at 213 (citation omitted). When a conflict exists between the judgment and the transcript of the trial court's statements, the transcript controls. *Id.* This court has previously said that to obtain relief under Rule 36:

> [T]he record in the case must show that the judgment entered omitted a portion of the judgment of the court or that the judgment was erroneously entered. The most reliable indicator that clerical error was made is the transcript of the hearing or other papers filed in connection with the proceedings which show the judgment was not correctly entered. In the

absence of these supporting facts, a judgment may not be amended under the clerical error rule after it has become final.

*State v. Davis*, No. E2000-02879-CCA-R3-CD, 2002 WL 340597, at *3 (Tenn. Crim. App. Mar. 4, 2002) (quoting *State v. Thomas*, No. 03C01-9504-CR-00109, 1995 WL 676396, at *1 (Tenn. Crim. App. Nov. 15, 1995)). Failure to award pretrial jail credits is a clerical error which does not render the sentence illegal. *Brown*, 479 S.W.3d at 213.

Defendant contends that the judgment form for count one contains a clerical error by granting him pretrial jail credits from July 30, 2021, to October 13, 2021, because he was arrested for the present offenses on July 30, 2020. He seeks a remand for this court to "instruct" the trial court to grant him credits. This same notation for pretrial jail credits also appears on the judgment form for count four. The record does in fact show that Defendant was arrested for the present offenses on July 30, 2020, rather than July 30, 2021, as reflected on the two judgment forms. However, as pointed out by the State, nothing in the record indicates that Defendant was continuously confined during that period of time, and the trial court did not address this issue at the sentencing hearing. Therefore, Defendant has not established a "clerical error" under Tennessee Rule of Criminal Procedure 36. *See Davis*, 2002 WL 340597, at *3. Defendant is not entitled to relief on this issue.

## CONCLUSION

Following our review, we reverse, vacate and dismiss Defendant's conviction for employing a firearm during the commission of a dangerous felony (count two). In all other aspects, we affirm the judgments of the trial court.

s/ *Jill Bartee Ayers*
JILL BARTEE AYERS, JUDGE